1  | Harold E. Franklin, Jr.
   | Georgia Bar No. 273416
2  | hfranklin@kslaw.com
   | KING & SPALDING LLP
3  | 1180 Peachtree Street, N.E.
   | Atlanta, Georgia 30309
4  | (404) 572-4600

5  | David L. Ayers
   | Admitted *Pro Hac Vice*
6  | dayers@watkinseager.com
   | WATKINS & EAGER PLLC
7  | The Emporium Building
   | 400 East Capitol Street
8  | Jackson, Mississippi 39201
   | (601) 965-1900

9

10 | Attorneys for Defendants
   | TOYOTA MOTOR CORPORATION,
11 | TOYOTA MOTOR SALES, U.S.A.,
   | INC., and TOYOTA ENGINEERING &
   | MANUFACTURING
12 | AMERICA, INC.

Joel H. Smith (SC SBN 5266)
joel.smith@bowmanandbrooke.com
BOWMAN AND BROOKE LLP
1441 Main Street, Suite 1200
Columbia, SC  29201-2897
(803) 726-7420
(803) 726-7421

Lead Defense Counsel For Personal
Injury/Wrongful Death Cases

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ESTATE OF IDA STARR ST. JOHN, by and through Executor of the Estate, WILLIAM CURTIS GRASTY, JR. v. TOYOTA MOTOR SALES, U.S.A., INC., et al.<br>Case No. 8:10-cv-01460-JVS - FMO | Case No. 8:10ML2151 JVS (FMOx)<br>Assigned to:  Hon. James V. Selna<br>Discovery:  Mag. Fernando M. Olguin<br><br>**TOYOTA DEFENDANTS' NOTICE OF MOTION AND DAUBERT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF <u>NEIL HANNEMANN</u>; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID L. AYERS IN SUPPORT THEREOF**<br><br>[DEFENSE  MOTION 7 OF 14]<br><br>[Proposed Order Filed And Served Concurrently Herewith]<br><br>Date:        September 30, 2013<br>Time:        1:30 p.m.<br>Courtroom: 10C |

5348726v7

1

1       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on September 30, 2013, at 1:30 p.m., or as soon

3 thereafter as the matter may be heard, in Department 10C of the Ronald Reagan Federal

4 Building and U.S. Courthouse at 411 W. Fourth Street, Santa Ana, California, Toyota

5 Motor Sales, U.S.A., Inc., Toyota Motor Corporation, and, Toyota Motor Engineering &

6 Manufacturing North America, Inc. (hereinafter collectively "Toyota defendants") will

7 and hereby do move this Court for an order excluding the expert testimony of Neil

8 Hannemann pursuant to the Federal Rules of Evidence Rule 702 and <u>Daubert v. Merrell</u>

9 <u>Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1988) and

10 its progeny.

11       Specifically, the Toyota defendants hereby request that the Court enter an Order

12 excluding the following testimony and evidence from trial:

13       1.     Hannemann's opinion that Ms. St. John:

14           a.     did not mistakenly apply the accelerator pedal, and

15           b.     was applying the brakes;

16       2.     Any opinions arising from the brake test Hannemann conducted; and

17       3.     Hannemann's opinions regarding brake pedal application forces.

18       Pursuant to the Court's Order No. 21: Revised Schedule for Second PI/WD

19 Bellwether Trial, the Toyota defendants are filing this Motion.  Pursuant to L.R. 7-3,

20 counsel for the Toyota defendants and counsel for Plaintiff have met and conferred and

21 discussed the various pre-trial motions being filed, and to the extent the parties have been

22 able to eliminate issues, they have.  As of this point in time, each side is filing the

23 motions they believe are appropriate.

24       This Motion is based upon this Notice of Motion and Motion, the Memorandum of

25 Points and Authorities in support hereof, the Declaration of David Ayers and the exhibits

26 attached thereto, on all papers and pleadings on file with the court herein, and on such

27 oral and/or documentary evidence that may be introduced at the time of the hearing.

28

1

DATED:  August 7, 2013

2

3

By:   /s/ David L. Ayers

4

Harold E. Franklin, Jr.
Georgia Bar No. 273416
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 572-4600

5

6

7

and

8

David L. Ayers
Admitted *Pro Hac Vice*
Watkins & Eager PLLC
The Emporium Building
400 East Capitol Street
Jackson, Mississippi 39201
(601) 965-1900

9

10

11

12

ATTORNEYS FOR DEFENDANTS
TOYOTA MOTOR CORPORATION,
TOYOTA MOTOR SALES, U.S.A., INC.,
and
TOYOTA ENGINEERING &
MANUFACTURING AMERICA, INC.

13

14

15

Joel H. Smith (SC SBN 5266)
Bowman And Brooke LLP
1441 Main Street, Suite 1200
Columbia, South Carolina  29201-2897
(803) 726-7420
(803) 726-7421

16

17

18

19

20

21

22

23

24

25

26

27

28

5348726v7

3

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

II.    HANNEMANN'S OPINIONS AND THEIR BASES.......................................2

    A.    Hannemann's Opinions Regarding Brake Application and Pedal
Misapplication..................................................................................................2

    B.    Hannemann's Brake Test .................................................................................4

    C.    Opinions Regarding Average Brake Forces .....................................................5

III.   ARGUMENT ......................................................................................................7

    A.    The Daubert Standard for Admission of Expert Testimony.............................7

    B.    Hannemann's Opinions do not Satisfy any Standard for Admission and
Should be Excluded .........................................................................................8

        1.    Hannemann's Opinions Regarding Brake Application and Pedal
Misapplication Should be Excluded Because they are Untested
and not Scientifically Valid................................................................8

        2.    Any Opinions Derived from Hannemann's Brake Test Should be
Excluded Because the Test Does Not Fit the Facts of this Case and
is  not Derived by Scientific Method .................................................9

            a.    Hannemann's Brake Test Does Not Fit the Facts of this Case ...9

            b.    Hannemann's Brake Test is not Derived by Scientific Method 11

        3.    Hannemann's Opinion Regarding Brake Force Should be Excluded
Because it is Unsupported and Does Not Fit the Facts of this Case ...12

            a.    The Literature upon which Hannemann Relies Does Not
Support his Opinion Regarding Brake Force............................12

            b.    Hannemann's Brake Force Opinion Does Not Fit the Facts
of this Case...............................................................................12

IV.    CONCLUSION .................................................................................................13

1

# TABLE OF AUTHORITIES

2 CASES

3 Daubert v. Merrell Dow Pharmaceuticals, Inc.

4   43 F.3d 1311 (9th Cir.1995) (Daubert II) ........................................................ 8

5 Daubert v. Merrell Dow Pharmaceuticals, Inc.

6   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)........................................... 1, 7

7 General Elec. Co. v. Joiner

8   522 U.S. 136, 118 S.Ct. 512 (1997)................................................................ 8

9 RULES

10 Federal Rules of Evidence Rule 702 ............................................................... 1, 7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Neil Hannemann's opinions are intended to support plaintiff's theory that the brakes in the subject 2005 Toyota Camry were inadequate to stop the vehicle during an unintended acceleration event.  His opinions are in large part merely based on certain speed calculations performed by Robert Caldwell, plaintiff's reconstruction expert. Caldwell calculated the unimpeded speed of the Camry, with wide open throttle, from the onset of this event through the point of impact with the tree.  Caldwell concluded that there was a three-to-seven mile per hour decrease in speed at the point of impact with the tree.  Based on nothing more than these calculations, Hannemann (1) ruled out pedal misapplication as the cause of this event, and (2) concluded that Ms. St. John was applying the brakes.  Hannemann did not perform any tests to support these conclusions. Hanneman's speculative opinions fail to satisfy the requirements for admission under Federal Rules of Evidence, Rule 702  and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., 509 U.S. 579, 113 S.Ct. 2786 (1993) and its progeny.

Not surprisingly, Hannemann conceded there "could be an infinite ranges of possibilities" to explain this nominal deceleration.  Deposition of Neil Hannemann, June 28, 2013, ("Hannemann Deposition"), Exhibit "A," at 29:9-10.  He even admitted –that the Toyota defendants' theory of pedal misapplication is a possible cause of this event. <u>Id</u>., Exhibit "A," at 61:15-17.  Hannemann acknowledged that his brake pedal application force ("brake force") test bore no relationship to the St. John event, and that "the one thing nobody knows is exactly how much brake force Ida St. John applied."  <u>Id</u>., Exhibit "A," at 97:10-12.  Hannemann went on to opine that the average driver applies 20 pounds of brake force, and drivers in emergencies only use 20 to 30 pounds of brake force, which he claims is insufficient to overcome the engine and stop the subject Camry.  However, the literature regarding brake force upon which Hannemann relied, and the data regarding brake force upon which plaintiff's expert Steven Loudon relied, do not support any aspect of this opinion. Based on the detailed discussion below, Hannemann's expert testimony

1

1  should be excluded in full from the trial of this case as unreliable and irrelevant.

2  II.   HANNEMANN'S OPINIONS AND THEIR BASES

3       As a preliminary matter it should be noted that Hannemann inspected the subject

4  2005 Camry and concluded that the "brake system was fine" and there were "no

5  performance issues with the brake system."   Hannemann Deposition, Exhibit "A," at

6  22:8-12 and 59:13-24.  Hannemann is not offering opinions that the Camry is defective in

7  design.  Id., Exhibit "A," at 22:14-19. The scope of Mr. Hannemann's work was "to

8  analyze the characteristics of the Camry, and then also to apply it to the particular case

9  and look at scenarios that relate to the vehicle having wide-open throttle and look at

10 braking characteristics in the event of a wide-open throttle acceleration."  Id., Exhibit

11 "A," at 21:20-25.

12      A.   Hannemann's Opinions Regarding Brake Application And Pedal

13           Misapplication

14      Hannemann "didn't deal with trying to calculate [his] own speed because [he]

15 didn't have all the physical characteristics."  Hannemann Deposition, Exhibit "A," at

16 29:20-22.   Instead, Hannemann relied on plaintiff's reconstruction expert Robert

17 Caldwell's calculation that the Camry achieved an unimpeded speed of 51 miles per hours

18 and an impact speed of 44–48 miles per hour.  Id., Exhibit "A," at 66:1-11 and 111:16-21.

19 According to Hannemann, this three-to seven mile per hour difference signifies that Ms.

20 St. John was applying the brakes prior to the impact:

21      Q.   So there's -- you're talking about 6, 7 miles an hour of speed that you

22           have to explain that you feel is only explainable by some braking

23           having occurred?

24      THE WITNESS: Yes.

25 Hannemann Deposition, Exhibit "A," at 111:22-112:2.  (Objection omitted).

26      Hannemann also concluded that this deceleration rules out pedal misapplication as

27 a cause of this event.  Id., Exhibit "A," at 24:9-16 and 25:25-26:22.  Significantly, there

28 are no tests to support Hannemann's conclusions.  As demonstrated above, the entire

5348726v7

1  basis for Hannemann's opinions that Ms. St. John applied the brakes and did not

2  mistakenly apply the accelerator is the nominal deceleration calculated by Caldwell.

3  However, Hannemann concedes there are an infinite range of possibilities to explain this

4  deceleration:

5      Q.    [I]f I understand you correctly, what you're saying, then, is having

6             developed an acceleration profile of the vehicle, knowing what the

7             distance is, knowing what an unimpeded wide-open throttle speed

8             would be, in your view the actual speed at the tree impact is lower

9             and, therefore, there must be some -- something else going on to

10            explain deceleration?

11     A.    Yes.  And that could be an infinite range of possibilities.  In the case

12            of wide-open throttle acceleration, it -- the most likely scenario is

13            braking effect.

14  Hannemann Deposition, Exhibit "A," at 29:1-12.

15         Hannemann even admits that pedal misapplication is one possible explanation for

16  the alleged "brake failure":

17     Q.    And on Page 7 under section E-5, you say:

18            'The fact that Toyota could not determine any cause of the reports of

19            brake failure leads me to the opinion that the driver perception of the

20            loss of power assist was either due to increased braking effort due to

21            an open throttle, or a loss of vacuum assist due to brake applications

22            while the throttle is open.'

23            Do you see that?

24     A.    Yes, I do.

25     Q.    Well, there's another alternative there, isn't there, which is pedal

26            misapplication?

27     A.    That's correct.

28  Hannemann Deposition, Exhibit "A," at 61:3-17.

1    Hannemann is aware of the phenomenon known as hypervigilance, where a driver
2    will persist in pedal misapplication for more than a few seconds, and also agrees it is a
3    possible cause of this crash.  Id., Exhibit "A," at 113:22-114:11.

4           B.    <u>Hannemann's Brake Test</u>

5    Hannemann conducted his own brake test to characterize the brake system under
6    various conditions of throttle opening and vacuum boost in order to support his opinion
7    that Ms. St. John could not stop the Camry because of an " 'increased braking effort due
8    to an open throttle, or a loss of vacuum assist due to brake applications while the throttle
9    is open.'"  Hannemann Deposition, Exhibit "A," at 58:7-16, 61:3-14 and 62:14-20.
10   Hannemann did not test how the Camry's vacuum assist would be depleted, but operated
11   with the hypothesis that Ms. St. John's vacuum assist was in fact depleted:

12        Q.    So for the purposes of this St. John case, are you operating under the
13               hypothesis that Mrs. St. John fully depleted the vacuum in her
14               vehicle?

15        A.    I believe that's likely, yes.
16   Id., Exhibit "A," at 65:13-17.

17   Hannemann then explained that this hypothesis was not really his opinion but
18   instead was based on Caldwell's speed reconstruction:

19        Q.    And what are the facts -- tell me your basis to conclude that she fully
20               depleted the vacuum.

21        A.    Well, the -- and I'm relying more on Caldwell's report, his
22               reconstruction.  I didn't actually analyze it.  But his reconstruction has
23               some scenarios where they simulated brake pumping at both 15
24               pounds of force and 50 pounds of force.  And in many of those
25               scenarios, the vehicle arrives at the speed in the 44 mile an hour range
26               versus a 51 mile an hour speed, which he states is the unimpeded, you
27               know, full acceleration of the vehicle.

28        Q.    Okay.  But -- so that -- that is the basis for your analysis in the

1     St. John case with respect to fully depleted vacuum?

2     A.     Well, I -- yeah, I guess that -- I'm not sure it's my opinion or I'm

3            really relying on Caldwell's report for the simulation of the

4            speeds.

5  Id., Exhibit "A," at 65:18–66:11.

6       Hannemann conceded that his brake pumping "ha[d] no bearing or relationship to

7  the St. John scenario.  Id., Exhibit "A," at 120:13-15.  During his test he pumped the

8  brakes where the pedal pressure went down to zero and then the brakes were reapplied.

9  Id., Exhibit "A," at 59:25-60:13.  His test did not show significant vacuum loss with two

10 brake applications or pumps.  Id., Exhibit "A," at 68:15-69:19.   Notably, Hannemann

11 concluded that the 2005 Camry can be stopped even with wide open throttle if the driver

12 presses hard enough on the brake.  Hannemann Deposition, Exhibit "A," at 49:15-19.

13 Finally, he admitted that the brake system in the subject Camry will overcome the engine,

14 even with loss of vacuum assist, depending upon the brake force applied.  Id., Exhibit

15 "A," at 126:18 – 127:1.  Tellingly, Hannemann is not offering opinions as to vacuum

16 boost alternatives.  Id., Exhibit "A," at 59:25-60:13.

17     C.     Opinions Regarding Average Brake Forces

18      Hannemann testified, "the one thing nobody knows is exactly how much brake

19 force Ida St. John applied."  Hannemann Deposition, Exhibit "A," at 97:10-12.   He

20 further admitted that he had not studied Ms. St. John's braking capability.  Id., Exhibit

21 "A," at 122:22-123:2.  To fill this evidentiary void, Hannemann speculates that the

22 average driver applies 20 pounds of brake force, and in emergency situations applies 20

23 to 30 pounds of brake force.  Id., Exhibit "A," at 49:23-50:4 and 75:7-12.  This opinion is

24 intended to demonstrate that the subject Camry in a wide open throttle situation could not

25 be stopped with the amount of force the average driver applies to the brake pedal.

26      Hannemann produced various articles to support his conclusion regarding average

27 brake forces, but none of the articles actually supported his conclusion.  Hannemann

28 Deposition, Exhibit "A," at 66:19-67:10 (admitting he was not familiar with a Society of

5348726v7

Automotive Engineers (SAE) paper entitled "Braking Behaviour in Emergencies," Exhibit 6 to the deposition, and further admitting he had only "looked at some" of the engineering literature regarding brake responses during emergencies); id. at 76:25-78:4 (admitting that a paper cited in Hannemann's expert report entitled, "Active Safety Experiments with Common Drivers for the Specification of Active Safety Systems," Exhibit 7 to the deposition, indicates a median brake force of 40 pounds, and does not indicate how many drivers in the test are using 20 or 30 pounds); id. at 79:3-80:25 (admitting that an article entitled "Effect of Brake Assistance System in an Emergency Situation," Exhibit 8 to the deposition, states 80 percent of the drivers in the test are above 100 newtons, meaning above 20 pounds of force);[1] id. at 83:1-88:23 (admitting that an article entitled "Histogram and Cumulative Frequency for Brake Pedal Stroke Speed," Exhibit 9 to his deposition, has 90 percent of the test drivers using more than 20 pounds of brake force, and only 10 percent of the test drivers using 20 pounds of force or less); id. at 89:22-93:15 (admitting that the "Man Factors" study performed on behalf of NHTSA, (first referred to as the manpower study), Exhibit 10 to the deposition,  did not support his proposition that 20 to 30 pounds of force is what most people apply in an emergency situation because in Trial 1, none of the test drivers applied less than 63 pounds of brake force and in Trial 2, the range of brake force was 25 to 289 pounds and more than 90 percent of the test drivers applied 60 pounds of force or higher); id. at 93:16-94:16 (admitting he was not familiar with the Ford study (Exhibit 11 to his deposition) cited within the "Man Factors" study where 99.5 percent of the female population generated 40 pounds or more of brake force); id. at 94:24-96:12 (admitting he was not familiar with the Mazzae study, Exhibit 12 to his deposition, entitled "Driver Crash Avoidance Behavior with ABS in an Intersection Incursion Scenario On the Iowa Driving Simulator," where test drivers applied an average brake force of 86 pounds).

Hannemann was even unfamiliar with the Cooper study utilized by plaintiff's

---

[1] One hundred newtons equals 20 pounds of force. Hannemann Deposition, Ex."A," at 79:11-12; id. at 88:8-10 (one pound equals 4.5 newtons).

1  expert Steven Loudon.  Hannemann Deposition, Exhibit "A," at 97:21-98:15.  Notably,
2  according to Mr. Loudon, the Cooper study indicated the lowest brake pedal force was 70
3  pounds and was achieved by a 61 year old woman.  Deposition of Steven P. Loudon,
4  June 20, 2013, ("Loudon Deposition"), Exhibit "B," at 136:13-139:4.

5       Ultimately, although Hannemann acknowledged that his opinion regarding the
6  average driver using 20 pounds of brake force, and 20 to 30 pounds of brake force in
7  emergencies, is central to his analysis of unintended acceleration, he reluctantly admitted
8  that every paper he cited "may not directly support that."  Hannemann Deposition,
9  Exhibit "A," at 89:6-21.  He went on to state that he had produced all of the studies on
10  which he was relying to support his brake force opinion.  Id., Exhibit "A," at 96:13-24.

11  III.   ARGUMENT

12       A.   The Daubert Standard for Admission of Expert Testimony

13       The central premise of Federal Rule of Evidence Rule 702 "is the scientific validity
14  and thus the evidentiary relevance and reliability—of the principles that underlie a
15  proposed submission."  Daubert, 509 U.S. at 594-595.  To ensure its evidentiary
16  reliability, expert opinion "must be derived by the scientific method," must constitute
17  "more than subjective belief or unsupported speculation," and must fit the facts of the
18  case. Daubert, 509 U.S. at 590-591.[2]

19  / / /
20  / / /
21  / / /
22  / / /
23  / / /

24

25  [2] For a more detailed recitation of the requirements that must be met before Court may
26  admit expert testimony under Federal Rule of Evidence Rule 702, and Daubert v. Merrell
   Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its
27  progeny please see the Toyota Defendants' "Notice of Motion and Daubert Motion to
28  Exclude the Expert Testimony of Carl Muckenhirn".

B.  Hannemann's Opinions Do Not Satisfy Any Standard for Admission and
    Should Be Excluded

    1.  Hannemann's Opinions Regarding Brake Application and Pedal
        Misapplication Should Be Excluded Because They are Untested and
        Not Scientifically Valid

Hannemann has not performed any tests to support his opinions that the nominal decrease in speed - as calculated by plaintiff's expert Caldwell - signifies that Ms. St. John did not misapply the accelerator and instead applied the brakes.  These opinions are not based on any principles or method, much less the requisite scientifically valid principles or method.  Hannemann merely offers his unsupported speculation as to the meaning of the nominal decrease in speed calculated by Caldwell.   This type of inadmissible expert opinion was addressed in Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir.1995) ("Daubert II ").  There the Ninth Circuit upheld the exclusion of expert testimony after noting that the expert did not explain the methodology followed and did not point to any external source to validate that methodology.  43 F.3d at 1318.  The Ninth Circuit concluded, "[w]e've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under Daubert, that's not enough." Id.  Two years later, in General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512 (1997) , the U.S. Supreme Court stated "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146.

Here, Hannemann's brake application and pedal    misapplication opinions cannot be submitted to the St. John jury because there is too great an analytical gap between Caldwell's speed calculations and Hannemann's opinions.  We have only Hannemann's *ipse dixit* that his opinions in this area are relevant and reliable as to the alleged defects that caused the St. John crash.  This is insufficient, and Hannemann's brake application

1 and pedal misapplication opinions should be excluded as unreliable and irrelevant.

2      2. <u>Any Opinions Derived From Hannemann's Brake Test Should Be</u>

3        <u>Excluded Because The Test Does Not Fit The Facts Of This Case And</u>

4        <u>Is Not Derived By Scientific Method</u>

5        a. <u>Hannemann's Brake Test Does Not Fit The Facts Of This Case</u>

6   Hannemann's brake test does not fit the facts of this case. Not only did

7 Hannemann admit that his brake pumping during this test bore no relationship to the

8 known facts of the St. John event, Hannemann Deposition, Exhibit "A," at 120:13-15, he

9 discounted Ms. St. John's testimony regarding pumping the brakes as follows:

10   Q. Okay. Now, under F(3) you say – you say: 'Brake applications during

11     a UA event are not the same as "pumping the brakes." ' Do you see

12     that?

13   A. Yes.

14   Q. Why are you drawing that distinction?

15   A. Well, it's -- it's -- let me explain the word. Different generations of

16     drivers, I find, have a different definition of pumping the brakes. Us

17     older drivers view pumping the brakes as an attempt to regain braking

18     effort once your wheels have locked up. With the advent of ABS,

19     people are trained not to pump the brakes; to apply the brakes. But it

20     is in a situation where a person doesn't get the braking they perceive

21     on a modern car with ABS, I use the term 'try again.' They are not

22     necessarily pumping the brakes to release them because they're not

23     locked. But they are just -- it's more of a diagnostic or an

24     investigative situation of, 'Gee, the brakes aren't working. I'm going

25     to try again.'

26 Hanneman Deposition, Exhibit "A," at 61:18-62:13.

27   During his test Hannemann pumped the brakes where the pedal pressure went

28 down to zero and then the brakes were reapplied. <u>Id</u>., Exhibit "A," at 59:25-60:13. This

1    method does not fit the facts of this case for two reasons.  First, Ms. St. John's testimony

2    regarding pumping the brakes is inconsistent.  At times she testified that she pumped the

3    brakes and at times she testified she pressed the brake continuously.  Trial Preservation

4    Deposition of Ida Starr St. John, September 13, 2010, Exhibit "C" at 79:12-80:2;

5    Discovery Deposition of Ida Starr St. John, September 13, 2010, Exhibit "D" at 119:16-

6    25 and 132:16-20.  Second, Hannemann testified that zero pedal pressure is not related to

7    this alleged UA event:

8         Q.    Now, but when you did your testing you literally were pumping the

9               brakes?  You were – the pedal pressure goes all the way to zero and

10              then

11              it's reapplied?

12        A.    Correct, because my testing was to characterize the brake system, not

13              to determine driver behaviors.

14        Q.    But are you saying that -- in this section are you saying that a driver

15              experiencing a UA event is going to release brake pedal pressure all

16              the way to zero?

17        A.    In situations where somebody will get the -- not get the expected

18              response due to braking, and one of the -- also, accompanied with

19              something

20              else, for example, an engine sound, something they don't expect, then,

21              you know, trying the brakes again seems likely and it's something that

22              people

23              have reported doing.

24        Q.    Okay.  But that's not my specific question.  My specific question is:

25              Are you saying that drivers in that scenario are literally taking their

26              foot off the brake to where the pedal has got zero pressure?

27        A.    You know, I haven't refined it to that degree.  Somebody could -- may

28              just release pressure.  Somebody may take their foot completely

1   off the brake because, as you said before, you know, pedal

2   misapplication does occur.   So somebody may take their foot

3   completely off the brake just to make sure they're getting their foot on

4   the brake. So that's -- so there's a wide range of things that could

5   happen, but it's not what I would call

6   traditional brake pumping.

7                                              . . .

8   Q.   All right.  What I'm trying to understand is how you are trying -- how

9        you would relate what you're describing here on Page 7 to your

10       characterization testing where you literally depleted the vacuum by 3

11       or 4 pumps where you've gone to zero brake pressure.

12  A.   My testing didn't -- I really wasn't concerned with how a vehicle

13       might arrive at no vacuum assist.  It was to characterize the brake --

14       the braking forces in the event of that occurrence. So there really --

15       there's no relationship between how it happens or the brake

16       characteristics when it

17            does happen.

18  Hannemann Deposition, Exhibit "A," at 62:14-63:21 and 64:25-65:12.

19       Based on Ms. St. John's testimony and Hannemann's testimony, his brake test does

20  not fit the facts of this case.  Further, Hannemann admitted that he, and in fact nobody,

21  knows "exactly how much brake force Ida St. John applied."  Id., Exhibit "A," at 97:10-

22  12.  He further admitted that he had not studied Ms. St. John's braking capability.  Id.,

23  Exhibit "A," at 122:22-123:2.   For these reasons, any opinions derived from

24  Hannemann's brake test are unreliable, irrelevant and inadmissible.

25            b.   Hannemann's Brake Test Is Not Derived By Scientific Method

26       Hannemann's brake test was based on the unsupported hypothesis that Ms. St. John

27  had fully depleted the vacuum assist.  Hannemann Deposition, Exhibit "A," at 65:13-17.

28  However, Hannemann did not provide any scientific principles or methods, analysis or

1   testing, to support this hypothesis.   As with his brake application and pedal
2   misapplication opinion, this hypothesis was based entirely on Caldwell's speed
3   reconstruction. Id., Exhibit "A," at 65:13–66:11.  And, as stated above, Hannemann did
4   not have data regarding the brake force Ms. St. John applied during this event and/or her
5   braking capability.  In sum, Hannemann's brake test does not fit the facts of this case and
6   is not derived by scientific method.  Accordingly, any opinions based on this brake test
7   should be excluded as unreliable and irrelevant.

8          3.    Hannemann's Opinion Regarding Brake Force Should be Excluded
9                Because It Is Unsupported And Does Not Fit The Facts Of This Case
10                a.    The Literature Upon Which Hannemann Relies Does Not
11                      Support His Opinion Regarding Brake Force

12         At his deposition Hanneman produced several articles which he claimed supported
13   his opinion that the average brake force required to stop the subject 2005 Camry was 20
14   pounds, and 20 to 30 pounds in emergencies.  However, these articles do not remotely
15   provide that support.   To the contrary, these articles demonstrated that the average brake
16   force was well above 20 pounds, or 20 to 30 pounds in emergencies.   Hannemann
17   Deposition, Exhibit "A," at 76:25-78:4, 79:3-80:25, 83:1-88:23, 89:22-93:15, 93:16-
18   94:16 and 94:24-96:12.   Hannemann was even unfamiliar with a study utilized by
19   plaintiff's expert Steven Loudon, where the lowest brake pedal force was 70 pounds and
20   was achieved by a 61 year old woman.  Id., Exhibit "A," at 97:21-98:15; Loudon
21   Deposition, Exhibit "B," at 136:13-139:4.

22         Therefore, Hannemann's opinion regarding brake force is unsupported by the very
23   literature upon which he relied to formulate that opinion.  Accordingly, this opinion
24   should be excluded as unreliable and irrelevant.

25                b.    Hannemann's Brake Force Opinion Does Not Fit the Facts of
26                      this Case

27         Hannemann admitted that nobody "knows . . . exactly how much brake force Ida
28   St. John applied." Hannemann Deposition, Exhibit "A," at 97:10-12. He further admitted

1 | that he had not studied Ms. St. John's braking capability.  <u>Id.</u>, Exhibit "A," at 122:22-

2 | 123:2.  Therefore, his conclusions regarding the brake force required to stop the subject

3 | Camry do not fit the facts of this case and should be excluded as unreliable and

4 | irrelevant.

5 | IV.    <u>CONCLUSION</u>

6 |      For all of the reasons set forth above, the Toyota defendants respectfully move this

7 | Court to exclude Neil Hannemann's opinions and testimony in full.

8 | DATED:  August 7, 2013

9 |

10 | By:    /s/ David L. Ayers

11 | Harold E. Franklin, Jr.
Georgia Bar No. 273416
          Joel H. Smith (SC SBN 5266)
          Bowman And Brooke LLP

12 | King & Spalding LLP
1180 Peachtree Street, N.E.
          1441 Main Street, Suite 1200
          Columbia, South Carolina  29201-2897

13 | Atlanta, Georgia 30309
(404) 572-4600
          (803) 726-7420
          (803) 726-7421

14 | and

15 | David L. Ayers

16 | Admitted *Pro Hac Vice*
Watkins & Eager PLLC

17 | The Emporium Building
400 East Capitol Street

18 | Jackson, Mississippi 39201
(601) 965-1900

19 |

20 | ATTORNEYS FOR DEFENDANTS
TOYOTA MOTOR CORPORATION,

20 | TOYOTA MOTOR SALES, U.S.A., INC.,
and

21 | TOYOTA ENGINEERING &
MANUFACTURING AMERICA, INC.

22 |

23 |

24 |

25 |

26 |

27 |

28 |

## DECLARATION OF DAVID L. AYRES

I, David L. Ayers declare as follows:

1.    I am an attorney admitted pro hac vice in this case and duly licensed to practice before all of the courts of the State of Mississippi.    I am a member of the law firm of Watkins & Eager, PLLC, attorneys of record for defendants Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Corporation (hereinafter "Toyota defendants").  I have personal knowledge of the facts set forth herein and if called upon I could and would competently testify thereto.

2.    This declaration is submitted in support of the Toyota defendants' Daubert Motion to Exclude the Expert Testimony of Neil Hannemann, and also serves to authenticate the exhibits submitted in support thereof.

3.    Attached hereto as Exhibit "A" are true and correct copies of the cited portions of the deposition of Neil Hannemann, dated June 28, 2013.

4.    Attached hereto as Exhibit "B" are true and correct copies of the cited portions of the deposition of Steven P. Loudon, dated June 20, 2013.

5.    Attached hereto as Exhibit "C" are true and correct copies of the cited portions of the Trial Preservation deposition of Ida Starr St. John, dated September 13, 2010.

6.    Attached hereto as Exhibit "D" are true and correct copies of the cited portions of the Discovery deposition of Ida Starr St. John, dated September 13, 2010.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of August, 2013, at Jackson, Mississippi.

/s/David L. Ayers
David L. Ayers

Page 1

1                   UNITED STATES DISTRICT COURT
2                   CENTRAL DISTRICT OF CALIFORNIA
3

4    IN RE: TOYOTA MOTOR CORP.      )Case No.:
     UNINTENDED ACCELERATION        )8:10ML2151 JVS (FMOx)
5    MARKETING, SALES PRACTICES,    )
     AND PRODUCTS LIABILITY         )
6    LITIGATION                     )
                                    )
7    This Document Relates To:      )
                                    )
8    Estate OF IDA STARR ST. John,  )
     by and through Executor of     )
9    the Estate, WILLIAM CURTIS     )
     GRASTY, JR. v. TOYOTA MOTOR    )
10   SALES, U.S.A., INC., et al.    )
                                    )
11   Case No. 8:10-cv-01460-JVS-    )
     FMO                            )
12   _____)
13

14

15        VIDEOTAPED DEPOSITION OF NEIL HANNEMANN
16                  Solvang, California
17                Friday, June 28, 2013
18

19

20

21

22   Reported by:
23   ASHALA TYLOR, CSR #2436, CLR, CRR, RPR
24   JOB NO. 62610
25

EXHIBIT "A"
0015

1      A.     We're getting a lot of use out of it.

2      Q.     Okay.  So going back to your work in the

3 St. John case.  After being hired in March of 2013,

4 give me a quick chronology of what you have done.

5      A.     Well, I reviewed documents sent to me,

6 which were mostly braking effectiveness reports.

7 Really customer -- customer complaints and issues

8 with the dealership.  So they were reports out of a

9 Toyota system that they had provided that related to

10 any kind of braking complaints.

11          And then I reviewed the accident report,

12 photos, really all the case material available.  And

13 after that review, I applied the test results, went

14 back through the testing and put together the report

15 using the testing I've done to demonstrate the brake

16 characteristics of the car.

17      Q.     So going back to your charge in this

18 case.  What was the -- what did Mr. Walburg

19 specifically ask you to do?

20      [A.     He wanted me to analyze the

21 characteristics of the Camry, and then also to apply

22 it to the particular case and look at scenarios that

23 relate to the vehicle having wide-open throttle and

24 look at braking characteristics in the event of a

25 wide-open throttle acceleration.]

Page 22

1     Q.   Were you asked to provide opinions with

2  respect to the design of the '05 Camry for the

3  purposes of this case?

4     A.   Well, I -- I'm looking at my assignment

5  here, but I was asked to inspect the vehicle.  And I

6  suppose if I'd found anything wrong with the brake

7  system that he might have asked me to render an

8  opinion. [But after the inspection, my opinion was

9  that the brake system was fine, that there were no

10  apparent malfunctions that I had noted with the

11  brake system, so that at least its performance was

12  as expected.] As far as any design defects in the

13  brake system, I wasn't asked to look at that.

14    [Q.   So for purposes of today, you're not here

15  to render any opinions with respect to conclusions

16  of defect in design of the '05 Camry?

17     A.   No.

18     Q.   Am I correct?

19     A.   You are correct, yes.]

20     Q.   Were you asked to analyze the crash?

21     A.   I was not asked to analyze the crash,

22  although in my part of my, you know, process of what

23  was to -- I just like myself to eliminate the

24  possibility of pedal misapplication in SUA cases.

25  And even though I was primarily looking at the brake

EXHIBIT "A"
0017

Page 24

1  event I describe as the situation where somebody

2  might have an event in a parking lot where they

3  within a second or two they hit another car or a

4  building.  And the other extreme are cases where

5  people have driven for literally miles without being

6  able to stop their vehicle.

7      Q.    Now, how did you go about -- well, strike

8  that.

9          [ Did you eliminate the possibility of

10  pedal misapplication in the St. John case?

11      A.    Well, I did based on the facts of the

12  speeds of the vehicle and the potential of the

13  vehicle under wide-open throttle acceleration.

14  There's a lot of ways to do it, you know, witnesses,

15  physical evidence.  But in this case it was

16  primarily the speeds of the reconstructions. ]

17      Q.    And that sounds like, from what you were

18  saying, that sounds like work that you've done kind

19  of post your report.

20      A.    Correct.  I didn't have Mr. Caldwell's

21  reconstruction prior to my report, so my report was

22  primarily the brake system characteristics.  So at

23  the time of the report, yeah, I didn't really have

24  that kind of data.

25          Probably since my report, rather than

EXHIBIT "A"
0018

Page 25

1    maybe call it a separate analysis, it may be that

2    the brake system characteristics that I've analyzed,

3    I feel, support Caldwell's reconstruction.

4           So it's not a separate and new opinion,

5    but reading his reconstruction and Dr. Germane's,

6    you know, I feel that my data analysis support his

7    reconstruction conclusions.

8       Q.   And it sounds like this was an analysis

9    that you did either prompted by or in the context of

10   looking at Mr. Carr's supplemental report?

11      A.   Well, his -- I would say his rebuttal,

12   rebuttal report, yes.

13      Q.   I'm sorry, rebuttal report.

14      A.   Yeah, there were a number of issues in

15   his report where I believe he either took my tests

16   out of context or even picked values off the tests

17   that aren't appropriate.  I don't feel they are the

18   appropriate values.  So he's done that in a number

19   of cases.

20          And then his comment about my analysis

21   relying on a 3 mile an hour difference in order to

22   determine if that was correct, I had to go back and

23   look at the reconstructions.  And my opinion is it's

24   closer to 7 or 8 miles an hour, not 3.

25        [ Q.   All right.  Why don't you just walk me

1   through that.   Tell me the -- how the distances and

2   speeds caused you to think that it makes sense that

3   this was not pedal misapplication.

4       A.     Well, talking about speed, the -- and

5   there's really two phases of this accident.   There's

6   the acceleration phase.   There's this first large

7   tree impact.   And after that impact, I think it's

8   fairly uncontested that -- a couple reasons.   Her

9   foot may have been dislodged off the brake pedal,

10  but the hash shaft was disconnected from the

11  vehicle.   So I think everybody agrees that at that

12  point there would have been no more engine power

13  applied.

14          So, but up to the first tree it's

15  basically if you calculate wide-open throttle

16  acceleration and the speed achieved there was, in

17  that kind of analysis, was 51 miles an hour, and

18  then the actual impact speeds were lower, and the

19  fact that the vehicle hit the -- hit the tree at a

20  slower speed then its wide-open throttle

21  acceleration capability indicates there was some

22  type of braking going on. ]

23      Q.    And so where is the -- you apparently

24  then have done some wide-open throttle testing that

25  allows you to conclude what speed you would expect

EXHIBIT "A"
0020

Page 29

1      [ Q.     Okay.  But if I understand you correctly,

2      what you're saying, then, is having developed an

3      acceleration profile of the vehicle, knowing what

4      the distance is, knowing what an unimpeded wide-open

5      throttle speed would be, in your view the actual

6      speed at the tree impact is lower and, therefore,

7      there must be some -- something else going on to

8      explain deceleration?

9         A.     Yes.  And that could be an infinite range

10     of possibilities.  In the case of wide-open throttle

11     acceleration, it -- the most likely scenario is

12     braking effect. ]

13        Q.     But there were some -- there were other

14     factors going on in this particular crash?  There

15     was a curb that had to be interacted with, if I

16     recall correctly, that would provide some decel?

17        A.     The curb could be -- generally, a curb is

18     a mile an hour or less kind of delta-v.  And there

19     was a down -- a downslope.

20            [ And that's why I didn't deal with trying

21     to calculate my own speed because I didn't have all

22     the physical characteristics. ] So, you know, the

23     speed, however it was arrived at, I believe

24     Mr. Caldwell has a 51 mile an hour speed as his

25     unimpeded speed to the tree.

Page 49

1    Q.    On this Test 2-32, how would you

2    characterize the brake force range?

3    A.    I would say it's an average of 30 pounds.

4    Q.    Okay.  So --

5    A.    And prob -- and it's 30 pounds after it

6    downshifts, and 20 -- 20 to -- you know, you can see

7    from 15 to 20 it goes from 15 to 25, so you might

8    average that to 20.  And that's -- so prior to the

9    downshift 20, and 30 after.

10   Q.    So at 45 miles per hour, with wide-open

11   throttle, with -- with regular vacuum, you can bring

12   this vehicle to a stop with 25, 30 pounds of brake

13   force?

14   A.    Yes.

15   [    Q.    So do you agree this data stands for the

16   proposition that the 2005 Camry can be stopped even

17   at wide-open throttle if the driver presses hard

18   enough on the brake pedal?

19   A.    Yes.  It all relates to brake force.   ]

20   Q.    And the tests we've looked at, the 30 --

21   the 30 and 45 mile an hour tests, we're looking at

22   brake forces under 30 pounds?

23   [    A.    Yes.  And we may get into it later, but

24   my opinion is it's, you know, a 20-pound force is

25   something that you could expect an average driver to

EXHIBIT "A"
0022

Page 50

1   apply.  And that's based on some studies I've looked

2   at.  But it's also based on Toyota documents that

3   I've seen that Toyota has about a 20-pound goal for

4   their own brake force criteria.  ]

5          Q.   Well, let's -- yeah, I'm going to -- I'm

6   going to get around to the Toyota -- to the studies.

7              But I want to talk -- I want to just

8   confirm the data in terms of where we have -- where

9   you have depleted vacuum.

10             MR. CHALOS:  Are we near a breaking

11  point?  We have been going a little over an hour.

12             MR. BERRY:  Oh, sure, that's fine.

13             THE VIDEOGRAPHER:  We are going off the

14  record at 10:18.

15             (Recess.)

16             THE VIDEOGRAPHER:  We're back on the

17  record at 10:27.

18  BY MR. BERRY:

19         Q.   All right.  Mr. Hannemann, we were

20  looking at your report, which I marked as Exhibit 3,

21  and some of the graphics.  And I'm just trying to

22  correlate them to your index and to the data

23  printout.

24             So if you look on at your report on Page

25  10, Figure 4.  This is 30 mile per hour, no boost,

EXHIBIT "A"
0023

Page 58

1    BY MR. BERRY:

2        Q.    Okay.  I just wanted to see how that data

3    would compare to the reconstruction issue, and I

4    understand that you believe that the data doesn't

5    apply.

6        A.    Correct.

7    [   Q.    Okay.  Now, in terms of -- we looked at

8    some of the examples of what you did here in this

9    testing, the index to which is Exhibit 5.  Given

10   that this was done in August 2011 and not for the

11   St. John case, what was your purpose?  Why did you

12   do this battery of tests in August 2011 on the '05

13   Camry?

14       A.    Yeah, as I said before, it was to

15   characterize the brake system under various

16   conditions of throttle opening and vacuum boost.   ]

17       Q.    You also did some park brake applies.

18       A.    Yes.

19       Q.    Why were you doing park brake applies?

20       A.    Again, just to investigate the effect it

21   would have on vehicle deceleration.

22       Q.    And this is as much curiosity as

23   anything.  You know I deposed you for the Uno case.

24   This testing wasn't disclosed in Uno, so I'm -- but

25   there's a park brake issue in Uno.  Is this just a

EXHIBIT "A"
0024

Page 59

1    coincidence?

2         A.    I would say it is, yes.

3         Q.    Because you didn't use this data in the

4    Uno case, right?

5              MR. CHALOS:  Objection, it's beyond the

6    scope of his deposition here today.

7              THE WITNESS:  Yeah, I don't believe I

8    did.

9              MR. BERRY:  Hard to take another hat off

10   sometimes.

11             MR. CHALOS:  Sure.

12   BY MR. BERRY:

13   [  Q.    All right.  Now, looking at your report

14   itself, we've already talked about you described

15   your assignment.  Looking at Page 4, in terms of the

16   vehicle inspection, you found no conditions that

17   would adversely affect the braking performance of

18   the subject vehicle, right?

19        A.    With the pieces of the system that were

20   remaining because the car had been picked over

21   pretty good by that time.

22        Q.    Subject to that?

23        A.    Subject to that, I found no performance

24   issues with the brake system. ]

25   [  Q.    Now, on Page 5 you have this discussion

EXHIBIT "A"
0025

Page 60

1    about alternatives to vacuum boost brake systems,

2    but you told me earlier you weren't offering defect

3    opinions.

4        A.    That's correct.

5        Q.    So for the purposes of this deposition,

6    you're not -- you're not saying that the Camry

7    should have had these alternative vacuum boost brake

8    systems?

9        A.    The purpose of this section was more

10   background.   And given that I may be explaining to a

11   jury how vacuum brakes work, I thought it was

12   pertinent to discuss other styles of systems.   So

13   it's more of a background situation.   ]

14       Q.    Okay.   And then on Page 7 you talk about,

15   quote, unquote, pumping the brakes, and I wanted to

16   ask you some questions about that section of your

17   report.

18            The concept of loss of vacuum assist,

19   that's not something that is peculiar to the '05

20   Camry?

21       A.    No.   It's a well-known characteristic,

22   something I've done testing for back in the '80s.

23       Q.    On Page 7 you say --

24       A.    Let me -- I should clarify.   It's

25   well-known characteristics among automotive

EXHIBIT "A"
0026

Page 61

1    engineers.  I would say it's not a well-known

2    characteristic amongst drivers of vehicles.

3         [ Q.    And on Page 7 under section E-5, you say:

4                      "The fact that Toyota could not

5                      determine any cause of the reports of

6                      brake failure leads me to the opinion

7                      that the driver perception of the

8                      loss of power assist was either due

9                      to increased braking effort due to an

10                     open throttle, or a loss of vacuum

11                     assist due to brake applications

12                     while the throttle is open."

13                Do you see that?

14       A.    Yes, I do.

15       Q.    Well, there's another alternative there,

16   isn't there, which is pedal misapplication?

17       A.    That's correct. ]

18       [ Q.    Okay.  Now, under F(3) you say -- you

19   say: "Brake applications during a UA event are not

20   the same as 'pumping the brakes.'"

21                Do you see that?

22       A.    Yes.

23       Q.    Why are you drawing that distinction?

24       A.    Well, it's -- it's -- let me explain the

25   word.  Different generations of drivers, I find,

EXHIBIT "A"
0027

Page 62

1    have a different definition of pumping the brakes.

2    Us older drivers view pumping the brakes as an

3    attempt to regain braking effort once your wheels

4    have locked up.  With the advent of ABS, people are

5    trained not to pump the brakes; to apply the brakes.

6              But it is in a situation where a person

7    doesn't get the braking they perceive on a modern

8    car with ABS, I use the term "try again."  They are

9    not necessarily pumping the brakes to release them

10   because they're not locked.  But they are just --

11   it's more of a diagnostic or an investigative

12   situation of, "Gee, the brakes aren't working.  I'm

13   going to try again."]

14   [   Q.    Now, but when you did your testing you

15   literally were pumping the brakes?  You were -- the

16   pedal pressure goes all the way to zero and then

17   it's reapplied?

18       A.    Correct, because my testing was to

19   characterize the brake system, not to determine

20   driver behaviors.

21       Q.    But are you saying that -- in this

22   section are you saying that a driver experiencing a

23   UA event is going to release brake pedal pressure

24   all the way to zero?

25       A.    In situations where somebody will get

EXHIBIT "A"
0028

Page 63

1   the -- not get the expected response due to braking,

2   and one of the -- also, accompanied with something

3   else, for example, an engine sound, something they

4   don't expect, then, you know, trying the brakes

5   again seems likely and it's something that people

6   have reported doing.

7           Q.      Okay.   But that's not my specific

8   question.   My specific question is:   Are you saying

9   that drivers in that scenario are literally taking

10  their foot off the brake to where the pedal has got

11  zero pressure?

12          A.      You know, I haven't refined it to that

13  degree.   Somebody could -- may just release

14  pressure.   Somebody may take their foot completely

15  off the brake because, as you said before, you know,

16  pedal misapplication does occur.   So somebody may

17  take their foot completely off the brake just to

18  make sure they're getting their foot on the brake.

19  So that's -- so there's a wide range of things that

20  could happen, but it's not what I would call

21  traditional brake pumping. ]

22          Q.      Have you looked at the literature to see

23  if there's any engineering literature with respect

24  to how people apply brakes in the event -- in an

25  unexpected event?

EXHIBIT "A"
0029

Page 64

1      A.    Well, there's not -- well, an unexpected

2   events, most of the studies I've seen the surprises

3   are created for some emergent situation not related

4   to the vehicle.  And a lot of these were done to

5   investigate the design parameters for panic brake

6   assist, so that system.

7            It's only been more recent where you've

8   got situations of braking in the event of a

9   wide-open throttle for a multiple of reasons.  And

10  it can even be a floor mat, something that's keeping

11  the throttle open.  And there are fewer studies

12  there.  But there, I think, in those studies, as far

13  as brake applications, there's, you know, a range of

14  opinions and findings in the studies that I've read.

15     Q.    Okay.  So what -- cite to me the studies

16  that you would rely on to support this proposition

17  on Page 7 F(3) about driver behavior in response to

18  a UA event.

19     A.    Well, like I said, the studies on UA

20  events, since that's more recent there's fewer

21  studies.  This, number 3, is based on more my

22  experience and training and reading testimony of

23  what -- of what people in these situations have

24  done.

25  [    Q.    All right.  What I'm trying to understand

EXHIBIT "A"
0030

Page 65

1    is how you are trying -- how you would relate what

2    you're describing here on Page 7 to your

3    characterization testing where you literally

4    depleted the vacuum by 3 or 4 pumps where you've

5    gone to zero brake pressure.

6         A.     My testing didn't -- I really wasn't

7    concerned with how a vehicle might arrive at no

8    vacuum assist.  It was to characterize the brake --

9    the braking forces in the event of that occurrence.

10   So there really -- there's no relationship between

11   how it happens or the brake characteristics when it

12   does happen.]

13      [   Q.     So for the purposes of this St. John

14   case, are you operating under the hypothesis that

15   Mrs. St. John fully depleted the vacuum in her

16   vehicle?

17         A.     I believe that's likely, yes.

18         Q.     And what are the facts -- tell me your

19   basis to conclude that she fully depleted the

20   vacuum.

21         A.     Well, the -- and I'm relying more on

22   Caldwell's report, his reconstruction.  I didn't

23   actually analyze it.  But his reconstruction has

24   some scenarios where they simulated brake pumping at

25   both 15 pounds of force and 50 pounds of force.

EXHIBIT "A"
0031

Page 66

1          And in many of those scenarios, the

2    vehicle arrives at the speed in the 44 mile an hour

3    range versus a 51 mile an hour speed, which he

4    states is the unimpeded, you know, full acceleration

5    of the vehicle.

6       Q.    Okay.  But -- so that -- that is the

7    basis for your analysis in the St. John case with

8    respect to fully depleted vacuum?

9       A.    Well, I -- yeah, I guess that -- I'm not

10   sure it's my opinion or I'm really relying on

11   Caldwell's report for the simulation of the speeds. ]

12              MR. BERRY:  What are we up to, 6?

13                   (Exhibit Number 6 was marked for

14                    identification and attached

15                    hereto.)

16              MR. CHALOS:  Do you have another copy of

17   that?

18   BY MR. BERRY:

19    [  Q.    I don't remember whether we talked about

20   this paper before.

21       A.    I haven't seen this one, so I don't think

22   we have.

23       Q.    Okay.  I couldn't remember whether this

24   was one of the ones you produced in the past.  So

25   this braking behavior in emergencies, you're not

EXHIBIT "A"
0032

Page 67

1    familiar with this paper?

2         A.    No, I don't think I've seen it.

3         Q.    Have you looked at the engineering

4    literature in terms of what people do in response to

5    vehicle emergencies in terms of braking?

6         A.    I've looked at some.  I can't say I've

7    looked at everything.

8         Q.    But apparently this is one that you

9    haven't looked at?

10         A.    Correct. ]

11         Q.    Now, so just so that it's clear, with

12    respect to Page 7, F(3), you are not testifying that

13    there are studies that demonstrate that drivers

14    experiencing a UA event will release brake pedal

15    pressure to the point of -- of zero pressure

16    repetitively?

17         A.    Can you start over again?

18              MR. BERRY:  Read it back for me.  I may

19    have butchered it.  I'll listen to it, too.

20                        (The record was read by the

21                        court reporter, as requested)

22                        "QUESTION:  Now, so just so that

23                        it's clear, with respect to Page

24                        7, F(3), you are not testifying

25                        that there are studies that

EXHIBIT "A"
0033

Page 68

1                         demonstrate that drivers

2                         experiencing a UA event will

3                         release brake pedal pressure to

4                         the point of -- of zero pressure

5                         repetitively?"

6              THE WITNESS:  Yes, as far as studies, I'm

7    not agreeing to that.

8    BY MR. BERRY:

9         Q.    You're not agreeing to that?

10        A.    I'm not stating that there's studies.

11        Q.    Okay.  Now, the paragraph 4, you say:

12                    "In some vehicles just the second

13                    application is enough to use

14                    significant vacuum assist."

15         [  With respect to the Camry, as I look at

16    the data, all the -- all the brake pumping you did I

17    saw three or four brake applications.

18        A.    That's correct.

19        Q.    Are you saying the Camry can suffer

20    significant vacuum loss with two applications?

21        A.    Yeah.  And the testing didn't show that.

22    I've been evaluating vehicles subjectively for the

23    last few years.  And, you know, it's -- you know, my

24    old school idea back in the '80s with stalled

25    engines, the target was to get three applications.

EXHIBIT "A"
0034

Page 69

1    But I have noticed recently with, not even with

2    wide-open throttle, sometimes even with closed

3    throttle, that the boost starts to decrease even on

4    the second application.   It may not decrease all the

5    way, but you may lose, you know, 50 percent of your

6    assist.

7         Q.    But with respect to the Camry and your

8    testing, I didn't -- did you do any vacuum depletion

9    tests where you only pumped twice?

10        A.    No.

11        Q.    So in terms of characterizing the Camry,

12   you're not saying that it loses significant vacuum

13   assist with just two brake pumps?

14        A.    My testing doesn't show that, but the

15   VRTC testing, I believe, came to that conclusion.

16        Q.    All right.   But it's not something you

17   evaluated in your testing?

18        A.    No.   I relied on the VRTC tests for that

19   opinion or that statement. ]

20        Q.    Now, on your report, Page 8, it says:   "A

21   series of tests were run..."  Do you see that,

22   "Vacuum Loss"?

23        A.    Yes.

24        Q.    It says:

25              "Initial analysis shows that at

EXHIBIT "A"
0035

Page 75

1          an emergency situation."

2          Do you see that?

3     A.     Yes.

4     Q.     And then on Page 9 you say:  "This," and

5  it's referring to the sentence above, about 80

6  pounds.

7          [    "This is also well beyond the amount

8               of force that most people will apply

9               in an emergency situation (20 to 30

10              pounds of force.)"

11         Do you see that?

12    A.     Yes.  ]

13    Q.     So tell me, list for me, the studies that

14  you are referring to that support that proposition.

15    A.     Well, they are in the technical papers.

16  But if you go to section, Roman numeral IX, number

17  4, so basically page 13 of my report.  And (a)

18  through (f) are six papers that I've used as studies

19  to arrive at those conclusions.

20    Q.     Okay.  Now, and I want to talk about them

21  one at a time but we're going to have to change tape

22  here.  But just one second.

23         Do you agree with me with respect to (a)

24  on page 13 (a), that paper doesn't have any test

25  data about brake pressure, brake pedal pressure

EXHIBIT "A"
0036

Page 76

1   application?

2        A.    I'd have to go look.  I think most of

3   these papers had either histograms or some type of

4   graph.  I don't know that they supplied the

5   individual data.

6        Q.    All right.  Well, that active safety

7   paper, I'll mark that as Exhibit 7.  And then while

8   we're changing tapes, if you think it has brake

9   pedal force data, could you find it for me?

10                    (Exhibit Number 7 was marked for

11                     identification and attached

12                     hereto.)

13             MR. BERRY:  Go ahead, off the record.

14             THE VIDEOGRAPHER:  This marks the end of

15   media number one of the June 28th, 2013 video

16   deposition of Mr. Neil Hannemann.

17             We're off the record.

18             (Recess.)

19             THE VIDEOGRAPHER:  We're back on the

20   record.  The marks the beginning of media number 2,

21   the June 28th, 2013, video deposition of Mr. Neil

22   Hannemann.  The time on my video monitor is

23   approximately 11:18 A.M.

24   BY MR. BERRY:

25        Q.    Okay.  Mr. Hannemann, before the break

EXHIBIT "A"
0037

Page 77

1    what I did was I marked as Exhibit 7 the paper that

2    you cite on the top of Page 13 of your report,

3    Exhibit 3, relating to studies of what drivers do in

4    terms of brake applications.

5            And my question to you was:  With respect

6    to this Exhibit 7, can you point to me any data in

7    that report that -- that supports your opinions that

8    drivers in emergencies only use 20 to 30 pounds of

9    brake pedal force?

10       A.    Well, in this particular report, the -- I

11   took quotes out of their synthesis of results

12   section, which are the 50 percent do not trigger ABS

13   and 50 percent do not reach 7 meters per second

14   squared of mean decel.

15           The only data they have is they have foot

16   displacement.  And then they do have a chart where

17   they compared maximum brake effort to from simulator

18   to track.  And the track data shows a median of --

19   this says 21.7 deca newtons, which would be about 40

20   pounds of force as a median.

21       Q.    40 pounds of force?

22       A.    Correct.

23       Q.    Okay.  Not the 20 to 30?

24       A.    Yes.  But if you have a median of 40, and

25   median, I believe, is half or above or half or below

EXHIBIT "A"
0038

Page 78

1    that.   So there are still would be a significant

2    amount of people pushing less than 40.   But this

3    particular paper, you can't tell how many are going

4    20 or 30. ]

5          Q.    Okay.   Then the second paper that you

6    cite, "Effect of Brake Assistance System in

7    Emergency Situation."

8          A.    Actually, can I back up for a second?

9          Q.    Sure.

10         A.    I believe that the total displacement --

11   no, that's a time.   Yes, that -- I thought -- here

12   we go.   I was thinking that they had an area where

13   we could -- I could calculate displacement to force.

14   But it's actually displacement time, so that

15   wouldn't work.

16         Q.    Okay.   Now, the second paper you cite,

17   "Effect of Brake Assistance System in Emergency

18   Situations," I'm going to mark that as Exhibit 8.

19                      (Exhibit Number 8 was marked for

20                       identification and attached

21                       hereto.)

22   BY MR. BERRY:

23         Q.    And this one you have an advantage on us

24   since it's in Japanese.

25         A.    Do you think that's an advantage?  Well,

EXHIBIT "A"
0039

Page 79

1    since I'm an engineer, I can read the charts.  I

2    won't claim that I can read the Japanese.

3       [    Q.    All right.  So in Exhibit 8, show me

4    where is the data that demonstrates that the

5    propositions that you include in your paper that 20

6    to 30 pounds of force is well beyond the amount of

7    force that most people will apply in emergency

8    situation?

9          A.    If you look on page 19 at the top right,

10   there's a histogram.  And it shows 40 percent of the

11   people are averaging 100 newtons, which is 20

12   pounds.  So I think that's a pretty good indication.

13         Q.    Where is this?

14         A.    This is on Page 19.  And it's the graph

15   at the very top right-hand corner of the page.

16         Q.    Average of braking effort?

17         A.    Yes.

18         Q.    And immediately below it, Figure 10,

19   maximum braking effort, you've got --

20         A.    Well, 20 percent at 100 in that case.

21         Q.    20 percent at 100 newtons, right?

22         A.    For a maximum number, yes.

23         Q.    You have 27 percent at 150 newtons?

24         A.    Correct.

25         Q.    In terms of cumulative frequency, 100

EXHIBIT "A"
0040

Page 80

1    newtons is down in the 5 percent range cumulative --
2    excuse me, the 20 percent range, right?
3        A.    No, I think that's frequency.   If you --
4    oh, okay.   100 newtons is about 20 and 150 newtons
5    is about 50 percent.
6        Q.    Okay.   I blew that chart up.
7              Mark this as 8-A, which is Figure 10
8    from --
9                      (Exhibit Number 8-A was marked
10                     for identification and attached
11                     hereto.)
12             THE WITNESS:   You didn't really need me
13   to pick that chart out for you, did you?
14   BY MR. BERRY:
15       Q.    Apparently not.
16             So Figure 10 from Exhibit 8, "Effect of
17   Brake Assistance System in an Emergency Situation,"
18   looking at cumulative, 80 percent of the people in
19   this test are above 100 newtons, right?
20       A.    For maximum.   And I've shown you, in
21   looking even at my test data, that maximums can be,
22   you know, momentary applies, and also physically a
23   lot of people can't maintain that, and it's much
24   more appropriate to look at the average braking
25   effort.

EXHIBIT "A"
0041

Page 83

1    [    Q.     And according to this study, which I've

2    labeled Exhibit 9?

3         A.     9.

4         Q.     According to this study, the average

5    pedal force was 364 newtons in the first test,

6    right?

7         A.     That's what it states here.

8         Q.     So in terms of supporting your

9    proposition that, "This is well beyond the amount of

10   force that most people will apply in an emergency

11   situation, 20 to 30 pounds of force," this study

12   Exhibit 9 does not support that?

13        A.     If you look on -- and they talk about the

14   average pedal force.  But if you look at Figure 8,

15   they've also got a histogram of brake pedal force.

16   And the 200 Newton point is about 50 percent

17   cumulative frequency.

18             And I think that the reason they have a

19   higher average than a median, because I think,

20   again, the median is about 40, is they've got some

21   applications here that are quite high.  I think that

22   may have affected their average.

23        Q.     Okay.  But you're looking -- Figure 8 is

24   the second test?

25        A.     Yes.

Page 84

1        Q.    If we look at Figure 6, which is the

2   first test, which you agree with me if you are going

3   to do an emergency maneuver test, you look at the

4   first time you do it?

5            MR. CHALOS:   Object to the form.

6   BY MR. BERRY:

7        Q.    Correct.

8        A.    It would depend on how you have the test

9   structured.

10       Q.    Well, you can go back and look at this

11  one.

12                      (Exhibit Number 9-A was marked

13                      for identification and attached

14                      hereto.)

15  BY MR. BERRY:

16       Q.    All right.   Well, you can go back and

17  look at this one.   But anyway, I've labeled 9-A the

18  data from the first test in this Exhibit 9, the

19  "Histogram and Cumulative Frequency of for Brake

20  Pedal Stroke Speed."   And this is the one for pedal

21  force, right?

22       A.    Yes.

23       Q.    And it looks like 90 percent of these

24  drivers are above 100 newtons?

25       A.    Well, you -- 100 newtons is about

EXHIBIT "A"
0043

Page 85

1      10 percent, 200 newtons is about 25 percent.  And --

2          Q.    And the --

3          A.    It's a little odd because on the

4      second -- like you said, you'd look at your first

5      test.  But you'd also expect as a person's had a

6      second chance to go through a test like this that

7      they would be expecting what's going to happen.  And

8      in this case they actually pushed a paper mache car

9      out in front of people.  You expect the second one

10     that they would push harder.

11              But in the second test you have over

12     50 percent of the people pushing at 200 newtons or

13     less.  So that's not intuitively obvious that you

14     would use less force your second time through a

15     simulated emergency.

16         Q.    Well, in fact, you say in -- you say in

17     your report on Page 13:

18              "There was also a second test for

19              each driver where the driver would

20              obviously be aware that something was

21              going to occur."

22         A.    Yes.

23         Q.    (Reading)

24              "In fact, the same 'surprise' was

25              presented the second time."

EXHIBIT "A"
0044

Page 86

1        A.     Yes.

2        Q.     That's why I pulled the data for the

3   first test.

4        A.     Yeah, and I agree that you would think in

5   a surprise that the first test would be more

6   appropriate, but then, just as equal to that, you'd

7   expect the second time through since the people are

8   aware and alerted that they would push harder.  So

9   there's, you know, a little bit of, I guess,

10  interpretation here on this test.

11       Q.     Well, if you go, look at the paper,

12  Exhibit 9, it explains it in Section 4.2 at least

13  why the authors think that happened.

14              Do you see that?

15       A.     So they were -- they were blaming it on

16  some precognition of what's going to happen.

17       Q.     And adjusting by the drivers.  In any

18  event, right there in Section 4-2 is where it says:

19  "The average pedal force was 364 newtons in the

20  first test," right?

21       A.     Right.  And 25 percent of the people were

22  less than 40 pounds of force.

23       Q.     Okay.  But the proposition in your paper

24  is:

25              "This is well beyond the amount of

EXHIBIT "A"
0045

Page 87

1              force that most people will apply in

2              an emergency situation, 20 to 30

3              pounds of force."

4          This paper, Exhibit 9, does not support

5   the proposition that most people will only apply 20

6   to 30 pounds of force, does it?

7      A.    If using the second test, it does.  Using

8   the first test, I would change the word "most" to

9   "many."

10     Q.    10 percent being many?

11     A.    Well, if at 40 percent it's 25 to

12  30 percent.

13     Q.    Did you misspeak?

14         Read that back, the answer.

15              (The record was read by the

16              court reporter, as requested)

17              "ANSWER:  Well, if at 40 percent

18              it's 25 to 30 percent."

19         THE WITNESS:  On chart -- even the first

20  chart, if you look at --

21  BY MR. BERRY:

22     Q.    9-A?

23     A.    Yeah, if you look at 200 newtons, it's

24  still 25 or 30 percent.  It's hard to read.

25     Q.    Okay.  But 200 newtons is almost 50

EXHIBIT "A"
0046

Page 88

1    pounds.

2         A.      It's about 40 pounds.

3         Q.      It's more than 40 pounds.

4         A.      Maybe 40 -- I'd have to get my calculator

5    out to --

6         Q.      All right.   We should all carry

7    calculators instead of phones.

8              Newton is 4.46 to the pound, right?

9         A.      4.448.

10        Q.      4.448.   So let's just do 4.5.

11             MR. CHALOS:   It's 44.96 or 45 pounds.

12   BY MR. BERRY:

13        Q.      45 pounds, okay.   But your proposition in

14   your paper, most people, you are saying most people

15   will apply 20 to 30 pounds of force in an emergency.

16   This paper does not stand for that proposition, does

17   it?

18        A.      This paper still has a significant number

19   of people pushing at 20 pounds or less.   10 percent

20   is still a significant number.

21        Q.      Okay.   But 10 percent of the subjects

22   isn't most of the subjects.   ]

23        A.      Right, I'm not -- I'm not relying on just

24   one paper.   I'm looking at all these papers.   And

25   we'll find later there's a paper that has

EXHIBIT "A"
0047

Page 89

1  extraordinarily low values that I reject their

2  numbers.  So it's -- I'm not relying on any one

3  paper.  And they all have different conclusions.

4  There's all these studies have done things

5  differently.  Just looking at overall trends.

6  [   Q.   All right.  But this proposition is

7  really pretty central to your analysis of unintended

8  acceleration, isn't it?

9      A.   Yes.  And I think the best -- I guess

10  reading into Toyota documents where they have set --

11  they've set 20 pounds of force.  They call it, they

12  say 90 newtons as their design goal for being able

13  to stop a vehicle under any conditions.  So I think

14  that's a endorsement that Toyota believes that's a

15  number where it's a significant brake application

16  for most of their customers.

17      Q.   But that doesn't -- that doesn't stand

18  for the proposition that most people will not apply

19  more than 20 or 30 pounds of force?

20      A.   There's still support for that.  Every

21  study in every paper may not directly support that. ]

22  [   Q.   Well, let's look at the next one.  It's

23  called the manpower study, right?

24      A.   Yes.

25      Q.   Or Man Factors, I'm sorry.  This will be

EXHIBIT "A"
0048

Page 90

1    Exhibit 10.

2                        (Exhibit Number 10 was marked

3                        for identification and attached

4                        hereto.)

5    BY MR. BERRY:

6              MR. CHALOS:   Do you have another copy of

7    that?

8              MR. BERRY:   Yeah.

9              MR. CHALOS:   Thank you.

10   BY MR. BERRY:

11       Q.    And this Exhibit 10, this is one of

12   the -- this is were what's cited on page 13(e) of --

13   of your report, correct?

14       A.    Yes.  Yes, it is.

15       Q.    And I noticed that there's places that

16   things are circled.  Is that your handwriting, for

17   example, in the executive summary?

18       A.    Yes, that's mine.  I'm not sure if

19   everything is mine because I -- this is an old

20   paper.

21       Q.    All right.  Well, turn to page 40 of

22   Exhibit 10.  "Table 8-1 - Frequency Distribution

23   Characteristics for Brake Pedal Forces."  In Trial

24   #1, the range of brake pedal applications 63 to 375

25   pounds, right?

EXHIBIT "A"
0049

Page 91

1      A.      Yes, that's what the paper says.

2      Q.      In Trial 1 in this study, nobody pressed

3  the brake pedal less than 63 pounds?

4      A.      That's correct.

5      Q.      How does this paper support the

6  proposition that 20 to 30 pounds of force is what

7  most people will apply in an emergency situation?

8      A.      Well, what -- maybe this -- this paper is

9  really noting that, even though they measured what I

10  think are some extraordinarily high brake courses,

11  their recommendation was to lower the threshold, the

12  design threshold, for maximum braking.

13          So it's a -- this paper, the conclusions

14  really don't match at all with the data.  And they

15  also comment in here how with many variables, you

16  know, it's -- I don't -- I don't even think they

17  trusted their own -- own data.

18          And then this first trial you're picking

19  out was a static test where people were placed in

20  the vehicle and just asked to push as hard as they

21  can.  There was no -- there was no driving attempt.

22  It was just sit in the car and push as hard as you

23  can.

24      Q.      All right.  And then Trial #2 was a

25  dynamic surprise, right?

EXHIBIT "A"
0050

Page 92

1          A.      Yes.

2          Q.      And the range was 25 to 289 pounds, the

3    mean 130 pounds?

4          A.      Yes.

5          Q.      I mean this study does not support your

6    proposition that most drivers do not press more than

7    20 or 30 pounds in an emergency, does it?

8          A.      This paper I would actually move into a

9    different category that -- because I -- the thing I

10   found most about this paper was that the forces they

11   measured were extraordinarily high, yet they

12   recommend that the maximum braking force, and this

13   would be for the FVSS is 135 standard, be decreased

14   by a substantial amount.

15         Q.      All right.   But you're not answering my

16   question.   This paper does not support the

17   proposition that you state in your report that 20 to

18   30 pounds of force is what the most that most people

19   apply in an emergency situation?

20         A.      I agree.   It's not for support of that.

21   It's for support that it's just a different --

22   probably a little different -- it should be done

23   separately if you can help -- if you are helping to

24   point out my -- I wouldn't call this grammar, but

25   maybe the sorting of my report.   This is probably an

Page 93

1    indication that FVSS 135 is too high.

2        Q.    If you look at Trial #2 there on Page 41,

3    there's a graph for Trial #2.  Do you see that?

4        A.    Yes.

5        Q.    And in terms of percent of the subjects,

6    at least in the way I read this, it looks like, you

7    know, 90 plus percent of the subjects are 60 pounds

8    or higher?

9        A.    Yeah, this paper, like I say, it had -- I

10   was just surprised at the extraordinary high forces

11   that they measured in this.

12       Q.    And this was a study that was performed

13   on behalf of the National Highway Traffic Safety

14   Administration, right?

15       A.    Yes.  ]

16   [   Q.    Have you gone and looked at the Ford

17   study that is referred to in this study?

18       A.    I don't believe I have.

19             MR. BERRY:  Exhibit 11.

20                      (Exhibit Number 11 was marked

21                      for identification and attached

22                      hereto.)

23   BY MR. BERRY:

24       Q.    Exhibit 11 is a paper by Eaton and

25   Dittmeier, Ford Auto Safety Research Office.

EXHIBIT "A"
0052

Page 94

1          Have you seen this before?

2     A.     I haven't looked at this one.

3     Q.     I'm sorry?

4     A.     No, I haven't seen this one.

5     Q.     This is a study that was conducted by

6     Ford to try to figure out the brake pedal forces

7     that people apply in a brake failure scenario.   And

8     you're not familiar with this at all?

9     A.     No.

10    Q.     Look at Figure 2 on Page 155 of

11    Exhibit 11.

12          99 and a half percent of the female

13    population, according to this study, can generate 40

14    pounds of pedal force or more?

15    A.     And I'd have to study this paper before I

16    could really comment on it, Mr. Berry. ]

17    Q.     Well, now you have a copy of it.

18    A.     And I may even get it.   I've not always

19    got depo exhibits back, but if I get it back from

20    this I'll definitely study it.

21    Q.     You know what?   Since the reporter has a

22    set, I think you can keep those.

23    A.     I can keep those, great.

24    [ Q.     I think we talked about this one before,

25    but I think this is probably the other paper that

EXHIBIT "A"
0053

Page 95

1    gets cited in terms of what drivers are capable of

2    doing in terms of pedal forces in a given scenario.

3    You remember this paper?  We'll mark it as

4    Exhibit 12.

5         A.    Yes.

6                        (Exhibit Number 12 was marked

7                        for identification and attached

8                        hereto.)

9    BY MR. BERRY:

10        Q.    This is the Mazzae, M-A-Z-Z-A-E, et al --

11        A.    Yes.

12        Q.    -- Driver Crash Avoidance Behavior with

13   Abs In an Intersection Incursion Scenario On the

14   Iowa Driving Simulator," right?

15        A.    Correct.

16        Q.    And this one, in this particular

17   maneuver, drivers were trying to avoid a surprise

18   incursion, drivers applied brake forces with ABS on

19   average 86 pounds, right?

20        A.    That's what the report says, although

21   overall, just to take one step back to a higher

22   level, I've been involved in many driving

23   simulators.  And one thing that no driving simulator

24   that I'd been in does well is simulate braking.  You

25   just can't get the right kind of braking

EXHIBIT "A"
0054

Page 96

1    representation in a simulator.  So where simulators

2    are good for a lot of things, they are just not a

3    good tool for measuring brake force.

4        Q.    Actually, these same NHTSA folks did the

5    same study on an actual test track, didn't they?

6        A.    Yes, they did.

7        Q.    And it looks like they did wet and dry

8    testing.  And then the test track environment, they

9    got average maximum brake pedal forces 64 to 68

10   pounds, right?

11       A.    I haven't really studied that paper that

12   closely so -- ]

13   [ Q.    All right.  That's fine.  So is there any

14   other study that you can point me to other than

15   these -- I've now -- and I haven't marked or talked

16   about the one with the extraordinarily low numbers

17   for the reasons you've already articulated.  You

18   don't -- you don't think it's credible?

19       A.    Yeah, just as I've said, there's some --

20   we've talked about ones where I feel are

21   extraordinarily high numbers and some with

22   extraordinarily low numbers.  But other than these

23   that I'm relying on, there's no other papers other

24   than these ones that we've talked about. ]

25       Q.    Okay.  So do you agree with me that the

EXHIBIT "A"
0055

Page 97

1   studies, that several of these studies that you have

2   cited, demonstrate that in all these studies most of

3   the subjects applied brake pedal forces higher than

4   the 20 or 30 pounds?

5          MR. CHALOS:  Object to the form.

6          THE WITNESS:  I would characterize it as

7   some drivers do and some drivers don't.  And -- and

8   those are great studies because they show that it

9   is -- there are people that don't apply enough brake

10  effort.  [And, you know, the one thing that nobody

11  knows is exactly how much brake force Ida St. John

12  applied.]  But it is reasonable that she applied

13  something less than 20 pounds of force.

14      Q.    And why would it be reasonable that she

15  applied something less than 20 pounds of force?

16      A.    I think in all -- in most of these

17  studies that I use, even at the very lowest 10 to

18  25 percent of the test subjects apply low forces.

19  And it just shows it's possible for people to do

20  that.

21      [  Q.    Now, have you -- you talked to Mr. Loudon

22  and I'm trying to remember, did you read -- did you

23  get Loudon's deposition?

24         A.    I read his deposition, but I've never

25  talked to him about this case.

EXHIBIT "A"
0056

Page 98

1    Q.    And did you see his discussion of

2 something called the Cooper study?

3    A.    I did -- I remember seeing that.  I

4 haven't read it.  I'm not sure what it is.

5    Q.    Does it apply to you?

6    A.    I haven't seen it, no.

7    Q.    Have you asked Mr. Walburg, "What is this

8 Cooper study?"

9         MR. CHALOS:   Object to the extent it

10 involves communications with lawyers.

11         MR. BERRY:   Oh, okay.   Sorry.   Didn't

12 mean to violate the Federal Rules.

13    Q.    Did you talk to Mr. Loudon about the

14 Cooper study?

15    A.    No, I didn't.  ]

16    Q.    Are you curious at all about the Cooper

17 study?

18    A.    I'm not sure it would affect my role in

19 this case.  You know, basically I'm taking my test

20 data to support Caldwell's reconstruction, so I'm

21 not -- not even sure if it would affect any -- any

22 of my opinions.

23         MR. BERRY:   13.

24              (Exhibit Number 13 was marked

25              for identification and attached)

EXHIBIT "A"
0057

Page 111

1      Q.    And at least according to this NHTSA

2   presentation, quote, require multiple conditions.

3   And the first bullet says:  "Defect condition must

4   result in sustained high-power at or near WOT."

5   Right?

6      A.    Yes.

7      Q.    So is that the assumption you're

8   operating under for the St. John case, that there is

9   a defect condition that's causing high power at or

10   near wide-open throttle?

11      A.    Yes.

12      Q.    For your analysis, the speed analysis

13   you're talking about, it has to be wide-open

14   throttle, doesn't it?

15          MR. CHALOS:  Object to the form.

16      [ THE WITNESS:  Yeah.  And I don't have a

17   speed analysis.  I referred and deferred to -- to

18   Ponderosa bob Caldwell, for the speed.  But his

19   speed analysis is 51 miles an hour with just

20   acceleration, pure acceleration, and an impact speed

21   of 44 to 48 miles an hour. ]

22      [ Q.    So there's -- you're talking about 6, 7

23   miles an hour of speed that you have to explain that

24   you feel is only explainable by some braking having

25   occurred?

EXHIBIT "A"
0058

Page 112

1          MR. CHALOS:   Object to the form.

2          THE WITNESS:   Yes.   ]

3    BY MR. BERRY:

4          Q.    And that's working from the premise that

5    the 51 miles an hour is wide-open throttle?

6          A.    That's correct.

7          Q.    If it was less than wide-open throttle,

8    you wouldn't -- that analysis wouldn't hold up?  You

9    wouldn't be talking about having a 6, 7, miles an

10   hour difference that you need to explain?

11          MR. CHALOS:   Object.   It's beyond the

12   scope of his opinions in this case.

13          THE WITNESS:   Yeah, and I haven't

14   considered anything less than wide-open throttle.

15   BY MR. BERRY:

16          Q.    Okay.  Did you look at -- turning to page

17   56 of Exhibit C to your report, this NC Study of

18   Pedal Errors.  Did you review this?

19          A.    I didn't review the study, the ANSI

20   study.  This is their, NHTSA's, summary of that

21   study, I would imagine.

22          Q.    Did you see on Page 62 the discussion

23   about the bullet that says:  "Why a driver would

24   persist in pressing the wrong pedal for several

25   seconds or more"?

EXHIBIT "A"
0059

Page 113

1       A.      I didn't read Schmidt's report.

2       Q.      And on Page 66 -- well, starting at, I

3  guess, starting at 65, "Failure to Correct."

4       A.      Yeah, this is starting to get into, you

5  know, areas outside of what I'm -- my opinion is.  I

6  think there's human factors people that are going to

7  address this type of behavior.

8       Q.      Yeah, but you -- but your -- but your

9  premise as to why you -- one of the reasons this is

10  not pedal misapplication is because it's longer than

11  you think is representative of pedal misapplication

12  events?

13      A.      Sure.

14      Q.      So that seems to me to be implicating a

15  kind of a human factors analysis.

16              MR. CHALOS:  Object to the form.

17              THE WITNESS:  Right.  And I'm not -- I

18  don't have an opinion as to how long a person would

19  persist.  It just -- it has an overall feeling that

20  this incident, to me, falls into a longer duration

21  situation than short duration.

22      [   Q.      Well, did you see on Page 66 of this

23  Exhibit C "Why do drivers sometimes persist in pedal

24  errors - for more than a few seconds"?  That's what

25  you're talking about?

EXHIBIT "A"
0060

Page 114

1    A.    I'm sure there are cases where people do.
2  I think that after a few seconds there has to be
3  some kind of an explanation for that, and it may not
4  apply in all cases.
5    Q.    Okay.  But on Page 66 here the
6  explanation is something called hypervigilance?
7    A.    It --
8    Q.    Are you familiar with that?
9    A.    Just I haven't studied it, but I'm aware
10 of the phenomena, and I agree it is a possible
11 cause. ]
12   Q.    All right. Okay.  Going back to your
13 conclusion A on Page 14.  So have you told me all
14 the bases of that conclusion?
15        Let me just withdraw that and ask it that
16 way:  How does conclusion A relate to the St. John
17 case?
18   A.    Well, it relates in the characteristic
19 that Caldwell is using in his reconstruction.  And
20 he's -- he's basing his opinions there on the VRTC
21 study.  And my conclusion A pretty much concurs with
22 that study.
23   Q.    And help me here.  How is he using the
24 VRTC study?
25   A.    For the brake characteristics that result

EXHIBIT "A"
0061

Page 120

1    trying to do it within a certain amount of time.

2        Q.    Sure.  But in Mrs. St. John's situation,

3    if you were going to posit that she has depleted

4    vacuum, that's going to take some time?

5        A.    And a better representation of that is in

6    Lee Carr's testing where he was -- he could complete

7    a brake pump in a matter of 10ths of seconds.  I

8    just noticed looking at his data that his brake

9    pumps were quite quick, quicker than I did mine.

10       Q.    Well, he, like you, are a highly

11   trained -- is a highly-trained driver?

12       A.    And I have no idea what his intent was.

13   [ I guess my point is my brake pumping in that testing

14   has no bearing or relationship to the St. John

15   scenario. ]

16       Q.    Well, do you have an opinion as to how

17   many times she pumped the brake in this crash?

18       A.    I really haven't studied how -- how in

19   this crash the scenario is for losing brake vacuum,

20   so I don't have an opinion on that.

21       Q.    Any other basis for the statement that

22   she was properly applying the brakes other than her

23   testimony?

24       A.    The reconstruction of speeds is another

25   basis that we've discussed.

Page 122

1   the test data, and I went through and we looked at

2   various tests with the wide-open throttle and no

3   boost.  And I think the highest I saw was that --

4   the highest brake pedal force that was required to

5   generate deceleration with wide-open throttle and no

6   boost was, like, 80 pounds pedal pressure.  Is that

7   right?  Sound right?

8        A.    That sounds in the ballpark for a test.

9   I wouldn't pin it as being the highest number.

10        Q.    Do you remember -- can you point me one

11   higher than 80 pounds to stop the vehicle with

12   wide-open throttle and vacuum depleted?

13        A.    I'd have to go through them all to check.

14   If you want me to do that --

15        Q.    That's all right.  The data is what it

16   is.

17        A.    Yeah, if somebody can find it, and since

18   I rarely push over 100, I mean 80 is pretty close.

19   I mean I did have a test where at the very end I

20   think you pointed out 150, but that was not a

21   specific condition that I would point towards.

22        [ Q.    What -- what assumption have you made as

23   to the capacity of Mrs. St. John to apply her

24   brakes?

25        A.    You mean her physical?

EXHIBIT "A"
0063

Page 123

1    Q.    Physical --

2    A.    I haven't studied that at all.    ]

3        Q.    You saw Mr. Carr's rebuttal report where

4    he talks about she weighed 182 pounds?

5        A.    Yeah.  And you know that there's two

6    premises he has that are a bit, I would say,

7    oversimplified.  The fact that you can stand on your

8    two feet at a certain weight in no way means you can

9    apply that kind of force to a brake pedal.  Because

10    even though people say "stand on the brakes," you

11    literally cannot stand on the brake pedal.  There's

12    no way.  You have to push it from a seated position.

13    So the standing theory is -- is not appropriate at

14    all.

15        And then his other theory about the

16    weight of a foot and a shoe.  And, again, you

17    can't -- the brake pedal is not like a bathroom

18    scale.  Bathroom scale you can put a shoe on it.

19    The brake pedal, it's more vertical and you can't

20    hang your foot on it.  In fact, you need to use

21    force just to get your foot up to the brake pedal,

22    muscle force.  So both of those premises that he has

23    are really not applicable and oversimplification,

24    I'd say.

25        Q.    Well, you saw on the manpower study.  I

EXHIBIT "A"
0064

Page 126

1    did some simulations with data, the VRTC data, 50

2    pounds.  And those results -- that resulted in

3    speeds within his range of speeds of impact.

4          Q.    But your testing with vacuum depleted and

5    wide-open throttle, in your testing it seemed like

6    your testing demonstrates that would significantly

7    slow the vehicle.  Is your data consistent with

8    Caldwell?

9          A.    At 50 pounds of brake force, the vehicle

10   does accelerate at a lower rate than it does with

11   wide-open throttle.  And with -- and with 40 to 45

12   pounds, a vehicle can maintain speeds of over 40

13   miles an hour with no deceleration.  So that really

14   verifies the simulations that Caldwell has done.

15         Q.    Okay.  You're referring to pedal effort

16   versus vehicle speed?

17         A.    Yes.

18    [    Q.    And the last sentence of C is:

19                "This lost of vacuum assist

20                contributes to the brake system being

21                unable to overcome the engine."

22         A.    Correct.

23         Q.    The brake system will overcome the engine

24   even with loss of vacuum; it's just a matter of how

25   much brake pressure?

Page 127

1      A.    Correct, it's dependent on brake force. ]

2      Q.    By the way, this Matt Hinsley discussion

3  on page 12 where you say, "500 newtons 'is about as

4  hard as I could push.'"

5      A.    Yes.

6      Q.    I went back and looked at that testimony.

7  He said that was his subjective impression, isn't

8  it?

9      A.    Subjectively it's about as hard as he

10  could push, yes.  He didn't have a force scale on

11  when he was --

12     Q.    Right.

13     A.    -- doing that.

14     Q.    Somebody was asking him, and he just

15  said, "Subjectively this is what I'm thinking"?

16     A.    Yes.

17     Q.    Okay.  And I suppose we could go out and

18  ask him to push hard on a pedal and find out.

19     A.    Yes, you could.

20     Q.    And you think 200 pounds is, about 200

21  pounds, is as much as you've been able to push?  Is

22  that dynamically or statically?

23     A.    Well, I haven't really done it, but I

24  would think that's -- that's probably in the range

25  of how hard I could push either dynamically or

EXHIBIT "A"
0066

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

      CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DISTRICT

2     ------------------------------------x

      IN RE: TOYOTA MOTOR CORP.            :

3     UNINTENDED ACCELERATION

      MARKETING, SALES PRACTICES,          :

4     and PRODUCTS LIABILITY LITIGATION    :

                                           : CASE NO. 8:

5     Case No. 8:10-cv-01460-JVS-FMO       : 10ML2151-

                                           : JVS(FMOx)

6     This Document Relates To:            :

      IDA STARR ST. JOHN, et al.           :

7     v. TOYOTA MOTOR SALES, U.S.A.,       :

      INC., et al.                         :

8                                          :

      Case No. 8:10-cv-01460-JVS-FMO       :

9     ------------------------------------x

10

11

12            ** HIGHLY CONFIDENTIAL **

13

14         DEPOSITION OF STEVEN P. LOUDON

15

16            San Diego, California

17

18          Thursday, June 20, 2013

19

20

21

22

23    Reported by:  NIKKI ROY

24              CSR No. 3052

25    Job No.: 62690

EXHIBIT "B"
0067

HIGHLY CONFIDENTIAL

Page 136

1    BY MR. SMITH:

2         Q.    Where are you -- if you don't mind, just

3    tell me where you're reading.

4         A.    Oh, I'm reading in Section 3.1.2.  Reading

5    through the -- the setup and summary --

6         Q.    Hmm.

7         A.    -- information.

8              (Document viewed by the witness.)

9              THE WITNESS:  The -- if you turn to page 12

10   where I summarize the data analysis of the brake

11   pumping study.

12   BY MR. SMITH:

13   [    Q.    Can I ask you, just before you get into

14   that, let me -- this testing, was this done by you?

15        A.    No.   I -- I did the vehicle set up for the

16   test and set up the data collection.   But the -- the

17   data I analyzed came from the study that was

18   conducted by Joel Cooper.

19        Q.    Okay.   So this is data from the Cooper

20   study?

21        A.    Yes, it is.

22        Q.    Okay.   All right.   So you told me to go to

23   page 12.

24        A.    Yes.   And based on the -- the analysis and

25   the charts that look at age versus brake pedal force,

EXHIBIT "B"
0068

HIGHLY CONFIDENTIAL

Page 137

1    I came to the conclusion that (reading):

2              It is clear from the data

3              presented here that even women who

4              are younger than Mrs. St. John were

5              not able to produce sufficient brake

6              force when asked to do everything

7              they could to stop the vehicle.

8              Since Mrs. St. John was at least

9              ten years older than most of these

10             women, it is quite likely that her

11             braking capability would have been

12             lower than the female participants

13             tested.

14        Q.   What was that average for the female

15   participants tested?  And we're talking about average

16   brake force, right?

17        A.   Yeah, yeah.  I didn't calculate what the

18   average was across the group.  I looked at the -- the

19   data as a trend as to what the average for each of

20   those individuals, how it -- how it changed as the --

21        Q.   Where is --

22        A.   -- the population aged.

23        Q.   Where is that data shown?

24        A.   On page 7.

25        Q.   Okay.  So on page 7, tell me -- explain

EXHIBIT "B"
0069

HIGHLY CONFIDENTIAL

Page 138

1    these charts to me.

2         A.   Okay.  So these charts are the average brake

3    pedal force generated by male and female

4    participants, top and bottom respectively.  And --

5         Q.   Okay.

6         A.   -- classified as those that weren't stopping

7    the vehicle, those that were slow to stop the vehicle

8    and those that brought the vehicle to a stop.

9         Q.   Okay.  As we look at all of these, the

10   lowest -- what's the lowest brake force or lowest

11   average brake force of any female participant?

12        A.   Seventy pounds.

13        Q.   And is that -- what I'm -- I'm looking at

14   the bottom scatter chart there.  And just -- and

15   that's a 60, what, two year old woman -- I'm sorry.

16        A.   61-year-old woman.

17        Q.   61-year-old woman?

18        A.   Yes, that's correct.

19        Q.   All right.  So that 61-year-old woman was

20   able to produce 70 pounds of force?

21        A.   Yes.

22        Q.   On the brake pedal?

23        A.   Right.

24        Q.   And that was the lowest that you -- you

25   recorded?

EXHIBIT "B"
0070

HIGHLY CONFIDENTIAL

Page 139

1      A.    As an average, that's correct, yes.

2      Q.    All right.   Were there any lower brake pedal

3  forces?

4      A.    Not that were measured in this test. ]

5      Q.    Okay.

6      A.    And the -- the age range of the

7  participants -- well, and I'll refer to -- to --

8  defer to Joel to talk more about the --

9      Q.    Joel Cooper?

10     A.    Yeah.   To talk more about the -- about the

11  population density and that of the participants.

12     Q.    I just want to make sure you're talking

13  about --

14     A.    Yeah.

15     Q.    -- not me.   Because I'll be happy to talk

16  about it, but I don't think anybody cares.

17     A.    But what I see is a trend towards lower and

18  lower brake pedal force as the -- as the participants

19  get older in both the top and the bottom charts.

20     Q.    Well, there's a -- but individually,

21  there's, for example, a 73-year-old -- -4 year old

22  woman who's able to apply almost 200 pounds of force?

23     A.    Yes.   There are always people in the

24  population who will be able to do that.

25     Q.    Uh-huh.   All right.   Let's look at 3.1.2.

EXHIBIT "B"
0071

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

CASE NO:  4:10-CV-75-CDL


IDA STARR ST. JOHN,

    Plaintiff,

vs.

TOYOTA MOTOR CORPORATION,

TOYOTA MOTOR SALES, U.S.A., INC.,

TOYOTA MOTOR ENGINEERING &

MANUFACTURING, INC.; and

TOYOTA MOTOR NORTH

AMERICA, INC.,

    Defendants.


    Video and oral deposition of IDA STARR

ST. JOHN, witness, called by PLAINTIFF, before

Cynthia M. Noakes, Certified Court Reporter in and

for the State of Georgia, taken at the Law Offices

of BUTLER, WOOTEN & FRYHOFER, 105 Thirteenth

Street, Columbus, Georgia 31902, on the 13th day

of September, 2010, commencing at 3:00 p.m.


* * * * * * * * * * * * * * * * * * * * * * * * * *

Page 79

1    A.    No.

2    Q.    Are you --

3    A.    I said no.

4    Q.    Okay.  I -- I didn't mean to talk over you.

5          If I do that, please tell me.  And I -- or I

6    know your lawyer will too.  I hope he will.

7          From the stop sign until the brick column,

8    it's -- you -- you put your foot back on the brake

9    and tried to stop the car; am I --

10   A.    I had -- yeah, I started.  I -- I -- I tried

11   to stop it the minute it took off.

12   Q.    And what did you do to try to stop it?

13   A.    I just kept trying to pump -- pump the

14   brakes.

15   Q.    All right.

16   A.    That's what I remember.

17   Q.    Did you pump the brake, or did you put your

18   foot on the brakes?

19   A.    I just put my foot on the brakes to try to

20   stop the car.

21   Q.    And did you push as hard as you could on the

22   brakes?

23   A.    Yes, I did.

24   Q.    Did you keep your foot on the brake and push

25   as hard as you could, to try to stop the car?

Page 80

1    A.     Yes.   Yes, I think I did.   That was my only

2    resource.   Yes, I did. ]

3    Q.    And as far as you know, did you keep your

4    foot on the brake, from the time you put it back

5    on until the time you hit the column?

6    A.    Yes.

7    Q.    Now, at the scene there, did you lose

8    consciousness?

9    A.    No.

10   Q.    And that's why you were able to tell us some

11   of these things that you described for us earlier?

12   A.    Right.

13   Q.    You remember the two gentlemen --

14   A.    Yes.

15   Q.    -- that sort of thing?

16        And you had -- you have a -- you had a good

17   recall of the crash?

18   A.    Yes.

19   Q.    And -- and I believe you told us just a few

20   minutes ago that, although you got to the hospital

21   and -- and you had a -- and you recalled the

22   crash, they gave you a shot, and that -- and

23   therefore, you didn't recall the crash until the

24   next day.  Is that what you told us earlier?

25   A.    Right.  Right.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION


CASE NO:  4:10-CV-75-CDL


IDA STARR ST. JOHN,

    Plaintiff,

vs.

TOYOTA MOTOR CORPORATION,

TOYOTA MOTOR SALES, U.S.A., INC.,

TOYOTA MOTOR ENGINEERING &

MANUFACTURING, INC.; and

TOYOTA MOTOR NORTH

AMERICA, INC.,

    Defendants.


    Video and oral deposition of IDA STARR

ST. JOHN, witness, called by DEFENDANTS, before

Cynthia M. Noakes, Certified Court Reporter in and

for the State of Georgia, taken at the Law Offices

of BUTLER, WOOTEN & FRYHOFER, 105 Thirteenth

Street, Columbus, Georgia 31902, on the 13th day

of September, 2010, commencing at 9:40 a.m.

    ****************************

EXHIBIT "D"
0075

Page 119

1   Q.    Okay.  Let me ask you, so you were -- did

2   you -- You were focused on looking ahead; is that

3   correct?

4   A.    Yes.

5   Q.    You were not looking down at your feet; is

6   that correct?

7   A.    No, no, no.  Huh-uh.

8   Q.    Okay.  So when you were driving, at no point

9   did you look down at your feet; is that correct?

10   A.    Oh, no.  Huh-uh.  Huh-uh.  No, huh-uh.

11   Q.    All right.  So you did not look down at your

12   feet, correct?

13   A.    No.  No, I didn't.

14   Q.    All right.

15   A.    No, huh-uh.

16 [ Q.    Okay.  And did you -- You used your right

17   foot --

18   A.    Right.

19   Q.    -- to put on the brake?

20   A.    To put the brakes on.

21   Q.    Okay.

22   A.    But the brakes -- I put them on.  I tried.

23   I kept trying to pump the brakes to see if it was

24   going to stop.  And the car just -- it just was

25   like a airplane.  It just took off. ]

EXHIBIT "D"
0076

Page 132

1    Q.    Okay.

2    A.    But I would take -- I take some medicine

3    that's prescribed for me.

4    Q.    Have you ever -- Have you ever, prior to the

5    incident that you're -- that we're discussing

6    today, have you ever experienced any unwanted

7    acceleration in any vehicle?

8    A.    No.

9    Q.    In terms of what you recall about trying to

10   stop the vehicle, as you were looking forward, did

11   you press as hard as you could on the brake pedal?

12   A.    I did.

13   Q.    Okay.  Did you do that with more than one

14   foot or just with your right foot?

15   A.    Just with my right foot.

16   [Q.   Did you keep your foot on the brake

17   continuously or did you pump the brake?

18   A.    I kept it on there continuously because I

19   thought I was stopping the car.  Yeah, I didn't do

20   that. ]

21   Q.    Did pressing on the brake pedal seem to slow

22   the vehicle at all?

23   A.    No.

24   Q.    So it had no effect?

25   A.    Huh-uh.